UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CEDRIC WATKINS,                    )
                                   )
        Petitioner,                )
                                   )    No. 3:17-cv-01321
v.                                 )
                                   )
DARREN SETTLES, *et al.*,          )
                                   )
        Respondents.               )

## MEMORANDUM OPINION

Cedric Watkins, an inmate of the Bledsoe County Correctional Complex in Pikeville, Tennessee, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction in the Davidson County Criminal Court of first-degree premeditated murder. Petitioner is serving a term of imprisonment for life in the Tennessee Department of Correction for this offense. (Doc. No. 1).

Presently pending before the Court is the Warden's answer to the habeas petition in which he asks the Court to dismiss the petition. (Doc. No. 11).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

## I.      Procedural History

Petitioner's first trial ended in a hung jury. (Doc. No. 9, Attach. 1 at PageID# 51). In 2013, after a second jury trial, Petitioner was convicted of first degree murder, and the trial court imposed a life sentence. (Doc. No. 1 at 1).

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's judgment on January 20, 2015. State v. Watkins, No. M2013-0212-CCA-R3-CD, 2014 WL 2547710 (Tenn. Crim. App. June 4, 2014), perm. app. denied (Tenn. Aug. 18, 2016). However, due to a discrepancy regarding Petitioner's sentence, the court remanded to the trial court for it to consider whether the judgment required correction of a clerical error. Id. at *8. The Tennessee Supreme Court denied Petitioner's application to appeal on Aug. 18, 2016. Id.

On January 20, 2015, Petitioner filed a timely pro se petition for state post-conviction relief. (Doc. No. 9, Attach. 11 at PageID# 783-806). On June 22, 2015, Petitioner filed an amended petition through counsel. (Doc. No. 9, Attach. 11 at PageID# 816-826). Following an evidentiary hearing, the post-conviction court denied relief on April 4, 2016. (Doc. No. 9, Attach. 11 at PageID# 830-859). The post-conviction court simultaneously granted Petitioner permission to file a delayed Rule 11 application to the Tennessee Supreme Court due to appellate counsel's failure to file a Rule 11 application for permission to appeal. Watkins v. State, No. M2016-00681-CCA-R3-PC, 2017 WL 1048130, at *4 (Tenn. Crim. App. Mar. 20, 2017), perm. app denied (Tenn. May 18, 2017). Petitioner's delayed Rule 11 application was denied on August 18, 2016. (Doc. Nos. 9, 10).

Petitioner appealed the denial of his post-conviction petition, and the Tennessee Court of Criminal Appeals affirmed on March 20, 2017. Watkins v. State, No. M2016-00681-CCA-R3-PC, 2017 WL 1048130 (Tenn. Crim. App. Mar. 20, 2017), perm. app denied (Tenn. May 18, 2017). The Tennessee Supreme Court denied Petitioner's application for discretionary review on May 18, 2017. Id.

On September 25, 2017,[1] Petitioner filed the instant pro se petition for writ of habeas corpus. (Doc. No. 1 at 15). On October 12, 2017, the Court ordered Respondent to respond to the petition. (Doc. No. 5). Respondent filed its answer on December 31, 2017. (Doc. No. 11).

In his petition, Petitioner asserts four claims for relief: his conviction is not supported by sufficient evidence because there was no physical evidence connecting him to the crime scene and because many of the witnesses were not credible; he was denied due process of law when the trial court erred by limiting the testimony of a defense witness; he was denied ineffective assistance of counsel when trial counsel failed to adequately investigate the case, specifically in failing to interview Lashona Wooten, and failed to consult with Petitioner prior to trial; and he was denied effective assistance of counsel when trial counsel failed to (1) call Clifford Parrish to testify, (2) properly cross-examine Deborah Cox, (3) object to Detective Corey Wall's hearsay statements, and (4) call Lashona Wooten to testify. (Doc. No. 1 at PageID# 5-11).

## II.    Summary of the Evidence

### A.    Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's March 18-20, 2013 second jury trial as follows:

> The victim's brother, Davis Turner, testified that the victim was fifty-two years old when he died. The victim had been in the Air Force and had worked for various defense industry firms. Mr. Turner testified that the victim had always had an interest in computers. Mr. Turner first learned in 1995 that the victim had a drug habit. He said that the victim had been living at InTown Suites and had owned a white Ford Probe at the time of his death.

---

[1] Under the "prison mailbox rule" of Houston v. Lack, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in Richard v. Ray, 290 F.3d 810, 812 (6th Cir. 2002) and Scott v. Evans, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Here, Plaintiff signed and dated his petition on September 25, 2017, although the Clerk's Office did not receive and file the complaint until September 29, 2017. Under the prison mailbox rule, the Court considers September 25, 2017, as the date of filing.

William Ogden testified that he was working at InTown Suites on July 28, 2009. When he was cleaning the parking lot, he smelled a distinct odor and notified his manager that there was probably a dead body on the premises. He could not determine from which room the smell was coming, so he waited for his manager to arrive. Together, they searched several rooms until they found the victim's body in room 135. Mr. Ogden knew the victim as "Bill." Mr. Ogden testified that he and the manager looked into the room but did not enter it. The manager, Kevin Moore, also testified and corroborated Mr. Ogden's testimony.

Lynette Mace, a crime scene technician with the Metro Nashville Police Department, testified that she processed the victim's room along with Sergeant John Nicholson. She described the room as an efficiency apartment. The victim was lying a few feet from the door. A chair was turned over, but there were no other signs of disarray. She saw two computers in the room. Ms. Mace found three spent nine millimeter shell casings and two projectile fragments. There was a "strike mark" on one wall, and she found a projectile lodged inside the wall at that location. Ms. Mace processed the room for fingerprints and "DNA touch evidence." She also used vacuum filters to collect any trace evidence.

Brianna Stanton testified that in 2009, she lived in various hotels with different people and abused crack cocaine. She said that "[m]ost of the time," she lived with appellant, whom she knew as "Frank White." Ms. Stanton said that she also lived with Stephanie Littlejohn and "Hannah." Other acquaintances included William Carter (a/k/a "Will C."), Bobby Gurley (a/k/a "B.O."), and Chaz Ellis (a/k/a "Cuz"). Mr. Carter was a barber and had a car. She was also acquainted with the victim, whom she knew as "Bill Gates." She recalled an occasion when the victim bought drugs and wanted to try the drugs before he left, which was unusual behavior for him. She and appellant later discussed the possibility of the victim's being a "snitch." Ms. Stanton testified that several days before she learned of the victim's death, Mr. Carter had driven appellant somewhere. When they returned, appellant, supposing that Ms. Stanton knew what had happened, said that they "were all supposed to take it to the grave." She said that she did not ask any questions. Ms. Stanton learned about the victim's murder on the news. When his murder was reported, appellant said, "'[W]ell, there it is.'" Sometime later, she heard that Mr. Carter had been "running around talking about" what appellant had done. Appellant called Mr. Carter to come to their hotel room, and he "asked [Mr. Carter] why he was running his mouth and smacked him for doing it." Ms. Stanton agreed that she had testified in a prior proceeding that appellant said something "along the lines of [ ] they had to do what they had to do to somebody who was snitching" and that "the four of us in the room would take it to the grave."

Ms. Stanton recalled that the first time she talked to detectives about the victim's murder, she denied any knowledge of what occurred. Detectives talked to her again in December 2010, while she was in jail, and she told them what she knew. Ms. Stanton and appellant spoke by telephone at least twice while she was in jail, on November 14, 2010, and December 19, 2010. The State introduced recordings of

those telephone conversations into evidence. In the November conversation, Ms. Stanton mentioned that she "hope[d] that [ ] everybody does what they said they were going to do," and appellant asked her whether she had heard from anyone "with a badge." Ms. Stanton testified that they were both referring to the victim's murder. In the December 2010 conversation, appellant told Ms. Stanton to "[s]tick to the script" and said that they would "fight this s* * * to the end." Ms. Stanton "guessed" that he was referring to the victim's murder. She agreed that she had previously testified that "sticking to the script" meant that no one would say anything.

Stephanie Littlejohn testified that in July 2009, she lived in hotel rooms and was engaging in prostitution and drug sales. She lived with appellant, whom she knew as Frank White. Ms. Stanton and "Hannah" also lived with her and appellant. Ms. Littlejohn testified that she was acquainted with Chaz Ellis, Bobby Gurley, William Carter, and the victim. She said that the victim was called "Bill Gates" because "[h]e was smart[, and] he fixed computers." Ms. Littlejohn recalled that the victim came to her hotel room on July 23, 2009, to take her to buy marijuana. When they returned to the hotel room, she gave the victim her laptop so that he could work on it. After the victim left, the group present at the hotel discussed whether the victim had "snitch[ed]" on Mr. Gurley and Mr. Ellis because they had been arrested. Ms. Littlejohn testified that appellant and Mr. Carter left the hotel to visit the victim. She said that she asked them to pick up her laptop while they were there. She further said that she "had a feeling" about the purpose of their visit but that "[i]t was kind of one of those things that [was] left unsaid."

Ms. Littlejohn testified that appellant and Mr. Carter returned thirty to forty-five minutes later. She recalled that appellant "was just in tears, and he said the Lord's prayer." Appellant had her laptop but would not let her have it. Ms. Littlejohn said that she learned about the victim's murder approximately a week later when it was reported on the news. She did not remember appellant's saying anything about the murder immediately after it was on the news, but she testified that at some point appellant told her that he had shot the victim three times. Ms. Littlejohn also testified that appellant confronted Mr. Carter about Mr. Carter's telling his girlfriend what had happened the day of the victim's murder. Appellant "smack[ed]" Mr. Carter and took him into the bathroom. Ms. Littlejohn remembered Mr. Carter's asking appellant not to kill him. Ms. Littlejohn testified that she did not talk to the police about the victim's murder until September 2010. At first, she denied any knowledge but eventually told the police the information about which she testified at trial.

On cross-examination, Ms. Littlejohn clarified that appellant told her on the same day of the murder that he had shot the victim, not at a later point in time. She also stated that she did not remember telling Deborah Cox about a statement made by appellant with regard to the victim's murder.

William Carter testified that he was acquainted with appellant, Ms. Littlejohn, and Ms. Stanton. He also knew Mr. Gurley and Mr. Ellis, but he did not know the victim. He said that he had heard "the women" talk about the victim and that he knew the victim was a drug user. Mr. Carter testified that Mr. Gurley and Mr. Ellis were both arrested in 2009 and that he subsequently heard a rumor that the victim was "snitching." He did not know whether the victim's alleged "snitching" was related to the arrests of Mr. Gurley and Mr. Ellis. Mr. Carter testified that on July 23, 2009, appellant called him to cut his hair. He went to the hotel where appellant was staying. After cutting his hair, appellant asked Mr. Carter to take him somewhere to pick up something. Mr. Carter did not consider that an unusual request. Mr. Carter drove appellant to InTown Suites at appellant's direction. When they pulled into the parking lot, appellant pointed out the car for which he had been looking. Mr. Carter identified a picture of that car, which had been previously identified as belonging to the victim. Mr. Carter said that he saw a woman he knew standing on the second or third level of the hotel. He spoke to the woman, and appellant told him to leave. He drove to the end of the building, where appellant got out of the car. Mr. Carter said that he turned his car around and then saw appellant running toward him, carrying a laptop computer. Appellant got into Mr. Carter's car, and they drove away. Mr. Carter testified that while in the car, appellant said, "'[T]wo shots to the head[;] he ain't talking no more.'" Mr. Carter said he did not know what appellant meant and that he had heard similar phrases "in some rap lyrics." Appellant also took off his shirt and threw it out of the window of the car. Mr. Carter did not see appellant with a gun that day.

Mr. Carter testified that when the news reported the victim's death, they showed a photograph of the InTown Suites. Mr. Carter told his girlfriend that he had driven appellant to that location, but he did not associate that incident with the victim's murder. He testified that approximately one month later, appellant called him to cut his hair. Mr. Carter went to appellant's hotel room and cut his hair. Subsequently, appellant punched him in the jaw and said, "'[B] * * * *, you been [sic] running your mouth about taking me to the room.'" Appellant also pulled him into the bathroom and told him that "if [he] ever said anything[,] someone would kill [Mr. Carter] and [his] family." Mr. Carter testified that the following day, he was arrested for failing to pay his child support obligations. He was incarcerated for five months. He was arrested on September 20, 2010, for a traffic violation and served five days in jail. While he was in jail for the traffic violation, Detective Wall came to speak with him about the victim's murder. He did not admit to knowing anything at that point. In March 2011, Mr. Carter saw on the news that he was wanted for first degree murder, so he turned himself in to the police. Detective Wall interviewed him again, and he gave a full statement.

Dr. Bridget Eutenier, an associate medical examiner in Davidson County, testified that the victim was shot in the front of his head three times: on his left eyebrow, in front of his left ear, and below his right eye. Two of the bullets exited, but one was recovered "from the posterior scalp." The victim's body was in a state of decomposition, making it difficult to determine the trajectory of the bullets. Dr.

Eutenier testified that "[a]ll three wounds would have been fatal." Dr. Eutenier estimated that the victim had died "a few days" prior to his discovery.

Metro Nashville Police Detective Corey Wall testified that he was the lead investigator in this case. He said that the victim's brother, Davis Turner, provided him with the victim's cellular telephone number. Subsequently, Detective Wall obtained the victim's telephone records. The last call that the victim made was on July 23, 2009, at 5:12 p.m. Detective Wall had the Identification Department compare fingerprints from people with whom the victim had communicated with the fingerprints lifted from his hotel room. There were no matches. In addition, no DNA was found in the victim's hotel room other than his own. The computers from the hotel room were also analyzed but contained no useful information.

Detective Wall testified that he also interviewed persons of interest identified through the victim's telephone records. In particular, he interviewed Stevie Downs, who suggested that he speak with Chaz Ellis. Detective Wall first spoke with Mr. Ellis in August 2009, but he denied any knowledge of the victim's murder. In July 2010, Mr. Ellis's attorney contacted Detective Wall and told him that Mr. Ellis wished to speak with him. When they met, Mr. Ellis suggested that Detective Wall talk to Stephanie Littlejohn and Brianna Stanton. Detective Wall and his partner, Detective Derry Baltimore, spoke with Ms. Littlejohn while she was incarcerated in September 2010. She was reluctant to divulge any information at first, but after they "leaned on" her, she told them about how she knew the victim and that the victim had been working on her laptop. She also told them about appellant's returning to their hotel room after having gone out with Mr. Carter. Ms. Littlejohn said that appellant gave her back her laptop, said a prayer for the victim, and told her that he had "shot the victim three times in the head." From Ms. Littlejohn's information, Detective Wall attempted to interview William Carter on September 30, 2010, but he refused to speak with the police. Detective Wall and Detective Baltimore interviewed Ms. Stanton in December 2010. She gave a statement that was consistent with Ms. Littlejohn's statement. Subsequently, Mr. Carter and appellant were both charged with the victim's murder. After Mr. Carter was taken into custody, he gave a statement that was consistent with Ms. Stanton's and Ms. Littlejohn's statements. Thereafter, appellant was arrested.

Tennessee Bureau of Investigation Agent Alex Brodhag testified as an expert in forensic firearms examination. He said that the police submitted the following evidence to him for analysis: a fired bullet core; three fired nine millimeter Luger cartridge cases; a fired jacketed bullet; a fired bullet core fragment; and a fired hollow point bullet jacket. Agent Brodhag determined that the three nine millimeter cartridges were fired from the same weapon. He further determined that the fired bullet core, the fired jacketed bullet, and the fired hollow point bullet jacket were consistent with nine millimeter bullets. The bullet core fragment was not useful for comparison purposes. The markings on the jacketed bullet and hollow point bullet jacket had the "same class characteristics," but there were not enough markings to conclude that they were fired from the same weapon. In addition, Agent Brodhag

could not determine whether the fired bullets were originally paired with the three cartridge cases and, therefore, could not determine how many weapons were used. Following Agent Brodhag's testimony, the State rested its case.

On behalf of appellant, Deborah Cox testified that Stephanie Littlejohn and Brianna Stanton lived with her for a time after July 2009. Ms. Cox said that Ms. Littlejohn told her, " 'I killed Bill Gates[;] I shot him in the back of the head[.][T]he gun will never be found[;] it's in pieces all over this town.' "

After the close of proof and deliberations, the jury found appellant guilty as charged. Appellant's motion for new trial was unsuccessful.

<u>Watkins</u>, 2014 WL 2547710, at **1-5.

## B.    <u>Post-Conviction Proceedings</u>

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction evidentiary hearing as follows:

Clifford Parrish, a long-time boyfriend of the petitioner's aunt, testified that Stephanie Littlejohn told him that she had committed the murder. He said he did not impart that information to the petitioner's defense team because he thought Ms. Littlejohn would take the initiative and tell them herself. On cross-examination, he testified he later told the petitioner's aunt about Ms. Littlejohn's confession. He was unsure, however, of when he divulged the information, testifying that it could have possibly been during the first or the second trial.

Lashona Smith, previously known by the married name of Lashona Wooten, testified that she gave testimony at the petitioner's first trial about having seen William Carter driving away from the hotel with a passenger in his vehicle on the day the victim was killed, but she was unable to see who the passenger was. She stated that she was subpoenaed as a witness at the petitioner's second trial, but, although the petitioner's trial counsel spoke to her outside the courtroom, she was never called to testify.

Deborah Cox testified that she testified at both of the petitioner's trials. She said that both trial counsel and his investigator interviewed her and that she was asked at the second trial about Ms. Littlejohn's statement that she had killed the victim and disposed of the gun.

The petitioner testified that his first trial ended in a mistrial after the jury was unable to reach a verdict. He said his family retained a different attorney for his second trial and trial counsel began representing him only twenty-one days before the second trial began. He claimed trial counsel visited him only two times before trial, in visits that lasted thirty minutes or less. According to the petitioner, trial counsel

never prepared him for testifying and never even discussed before trial whether or not he would testify. He said he consequently felt unprepared to testify, which is why he opted not to take the stand in his own defense. Had he been prepared and testified, he would have told the jury that he did not kill the victim.

The petitioner also complained about trial counsel's failure to call Ms. Wooten and Mr. Parrish as witnesses and his failure to effectively impeach Ms. Cox's testimony with her testimony from the first trial. He said he wanted trial counsel to call Ms. Wooten as a witness at his second trial because she had testified at his first trial, which resulted in a hung jury, and he believed her testimony would have made a difference in his second trial. He said counsel never explained to him why he failed to call her as a witness.

The petitioner testified he had no knowledge before either of his trials about the information Mr. Parrish provided at the evidentiary hearing, but also no knowledge of what kind, if any, investigation trial counsel conducted or if counsel could have discovered Mr. Parrish as a potential witness. As for Ms. Cox, he believed that counsel should have impeached her testimony at his second trial with her testimony from the first trial. He explained that in the first trial, Ms. Cox simply testified that Ms. Littlejohn told her that she had committed the crime, while in the second she testified that Ms. Littlejohn told her that she had shot the victim in the back of the head. The petitioner said he thought trial counsel should have asked Ms. Cox to read from her previous trial testimony to show the jury the discrepancies in her accounts.

The petitioner also complained that trial counsel failed to object to hearsay testimony by Detective Corey Wall about having been told by Chaz Ellis to speak to Ms. Littlejohn about the crime. Lastly, he claimed that trial counsel fell asleep during his trial, testifying that counsel was "supposed to have been taking notes," but his paper fell to the floor twice while he was sitting at the defense table.

On cross-examination, the petitioner denied that his family retained trial counsel shortly before his second trial because he was not getting along with his former counsel. Instead, he claimed that trial counsel "showed up alleging that he was his attorney" and when he called his family to inquire, they told him that they had hired him. The petitioner acknowledged that his first jury had voted 11 to 1 to convict him. Because his first trial ended in a hung jury, he thought trial counsel should have "follow[ed] the same platform [of the first trial] instead of subtracting from what ha[d] already been laid out as a foundation." He said he told trial counsel that his words of "stick to the script" meant to tell the truth and that counsel told him he would find someone from the African–American community to testify to that effect. The petitioner disagreed that Ms. Wooten's testimony that someone else was in the car with Mr. Carter helped the State's case. On redirect examination, he reiterated his belief that Ms. Cox's testimony from the first trial that she was unable to see who was in the car with Mr. Carter helped his defense in the first trial.

Trial counsel, called as a witness by the State, testified that he had been licensed to practice law for approximately thirty-nine years. He said he was contacted by the petitioner's aunt and other family members who indicated that the petitioner's relationship with his former counsel was "strained" and asked him to take over the case. During his appearance notice, three weeks before the scheduled trial, the trial court addressed the fact that the trial had been set for a number of months and could not be reset. Trial counsel stated that he thought his taking on the case was what the petitioner needed and "a positive situation" due to the petitioner's strained relationship with his former counsel. Former counsel was very cooperative, furnishing him with "everything he had," and trial counsel devoted all of his time from the date he was retained until trial in preparing for the case.

Trial counsel testified that he met with the petitioner three different times, for a total of over three hours, in his preparation for the case. He characterized their meetings as "very productive," testifying that he and the petitioner communicated well and reviewed together the first trial transcript "line by line." Among other things, he and the petitioner discussed the State's evidence against the petitioner, potential witnesses and theories of defense, and which factors in the first trial had not been favorable to the petitioner. The petitioner was very interested in having Ms. Littlejohn and Ms. Cox as witnesses, but he never mentioned Mr. Parrish. Trial counsel said he also "zeroed in" on the petitioner's "stick to the script" statement, spending "the better part" of one or two days trying through his connection with the "Nashville Inner City Ministry" to find someone to testify that in the African–American community the words could be interpreted as "tell the truth as opposed to say what we had planned to say." He could not, however, "find anyone that would agree that they could do that in good conscience."

Trial counsel testified that he considered calling Ms. Wooten as a witness at the second trial. However, after talking with her, he "had ... chills" based on the way she expressed herself and therefore believed that she would not "be anything but a possible liability" for the petitioner if she testified. He said he spoke with Ms. Cox twice before trial, provided her with gas money to travel to the trial from her home in Kentucky, and called her as witness. He repeated that the petitioner never mentioned Mr. Parrish at all.

Trial counsel further testified that he had extensive conversations with the petitioner about the pros and cons of testifying in his own defense and that it was the petitioner's ultimate decision. In addition, the trial court conducted a "very, very thorough examination" with the petitioner about his decision not to take the stand.

On cross-examination, trial counsel testified he had never tried a first degree murder case with only three weeks of preparation. He said he met with the petitioner either the same day that the petitioner's aunt retained him, or the following day. He also informed the petitioner, upon assumption of the case, "that it was [his] understanding that the Court would not grant a continuance because [he] came into the case." Trial counsel testified that he "would have liked a little more latitude in

... developing Ms. Cox's testimony," but he was limited by the trial court's rulings. Trial counsel reiterated that Ms. Wooten's demeanor and body language on the day of the trial led him to believe, based on his years of experience, that she would be a liability if he called her as a witness. Finally, trial counsel categorically denied that he at any point fell asleep during the trial.

The petitioner's aunt, Janice Gordon, called as a rebuttal witness by the petitioner, testified that she noticed trial counsel drop his head and start to "drift off" at least three times during the trial. On cross-examination, Ms. Gordon testified that the petitioner was in agreement with the family's decision to hire trial counsel to replace the petitioner's original counsel, whom they believed was not representing the petitioner well.

On April 4, 2016, the post-conviction court entered an order denying the petition for post-conviction relief based on the allegations of ineffective assistance of trial counsel. The court, however, granted the petitioner a delayed appeal to the supreme court due to appellate counsel's failure to file a Rule 11 application for permission to appeal. That same day, the petitioner filed a timely notice of appeal to this court in which he challenged the post-conviction court's finding that he received effective assistance of trial counsel.

Waktins, 2017 WL 1048130, at **2-4.

## III.   Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant

a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the

Supreme Court as one of total exhaustion. <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. <u>See</u> <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971); <u>see also</u> <u>Pillette v. Foltz</u>, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." <u>Alley v. Bell</u>, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." <u>Id</u>. at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. <u>Lucas v. O'Dea</u>, 179 F.3d 412, 418 (6th Cir. 1999) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. <u>Id</u>. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. <u>Murray</u>, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. <u>Id</u>. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other words, Martinez requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." See id. at 13-15. Importantly, Martinez did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (citing Murray, 477 U.S. at 496).

## IV.     Analysis

With these principles in mind, the Court will turn to the examination of the claims raised in Watkins's petition for habeas relief.

### A.     Sufficiency of Evidence claim

In his first claim, Petitioner alleges that the evidence was insufficient to sustain his conviction. (Doc. No. 1 at PageID# 5). Specifically, Petitioner argues that "[t]here was no physical evidence connecting him to the crime scene and that many of the witnesses were not creditable [sic]." (Id.) In his answer, Respondent contends that the determination by the Tennessee Court of Criminal Appeals that the evidence is legally sufficient to support Petitioner's conviction was not contrary to, or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts, in light of the evidence presented at trial. (Doc. No. 11 at PageID# 10).

Petitioner raised this claim on direct appeal. (Doc. No. 9, Attach. 6 at PageID# 672). Therefore, this Court must presume the correctness of the state court's factual determinations. 28 U.S.C. § 2254(e)(1). Petitioner may rebut this presumption only with clear and convincing evidence. Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

On sufficiency of the evidence challenges, habeas relief is warranted "only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (internal quotation omitted); see Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original).

In considering Petitioner's sufficiency of evidence claims in its opinion, the Tennessee Court of Criminal Appeals began by setting forth the correct legal standard:

> The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979) (citing Johnson v. Louisiana, 406 U.S. 356, 362, 92 S. Ct. 1620, 32 L.Ed.2d 152 (1972)); see Tenn. R.App. P. 13(e); State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).
>
> On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" Davis, 354 S.W.3d at 729 (quoting State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997); State v. Pruett, 788 S.W.2d 559, 561 (Tenn.1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. Dorantes, 331 S.W.3d at 379; Cabbage, 571 S.W.2d at 835; see State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is

insufficient to support the jury's findings. <u>Davis</u>, 354 S.W.3d at 729 (citing <u>State v. Sisk</u>, 343 S.W.3d 60, 65 (Tenn. 2011)).

<u>Watkins</u>, 2014 WL 2547710, at *5.

The court next considered the definition of the crime for which Petitioner was convicted:

Tennessee Code Annotated section 39–13–202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

<u>Id</u>. § 39–13–202(d).

<u>Watkins</u>, 2014 WL 2547710, at *6.   The state appellate court considered the evidence adduced at trial and determined that it was sufficient to meet each of the elements of the offense.  Petitioner believed the victim to be a "snitch," went into the victim's hotel room, and shot him three times in the head.  <u>Id</u>. Stephanie Littlejohn and Brianna Stanton both testified that Petitioner was concerned that the victim had given information to the police. William Carter testified that he drove Petitioner to the victim's hotel room, Petitioner left the car briefly and, when he returned, he commented, "'[T]wo shots to the head [;] he ain't talking no more.'"   <u>Id</u>.   Mr. Carter's testimony was corroborated in part by Ms. Littlejohn's testimony. Ms. Littlejohn testified that the victim had her laptop and, because she knew Petitioner was going to visit the victim, she asked him to bring her laptop back when he returned. When Petitioner returned from his outing with Mr. Carter, he had her laptop in his possession.  Ms. Littlejohn also testified that Petitioner said a prayer for the victim and told her that he had shot the victim three times in the head. The medical examiner confirmed that the victim had three gunshot wounds to the front of his head.

In challenging the sufficiency of the evidence used to convict him, Petitioner argued that the witnesses's testimonies were not credible. The Tennessee Court of Criminal Appeals found that this argument was without merit because all witnesses had been thoroughly cross-examined, and the jury assessed the testimony of the witnesses and evidence at trial. <u>Id</u>. at *7. The court ultimately concluded that the evidence was sufficient for a reasonable juror to find that Petitioner committed first-degree murder. <u>Id</u>.

Here, the decision of the Tennessee Court of Criminal Appeals was not an unreasonable application of the facts or contrary to law, even though there was no physical evidence linking Petitioner to the crime scene.

The state appellate court's finding that the State established that Petitioner committed the intentional and premeditated killing of the victim beyond a reasonable doubt was not unreasonable. A defendant's "state of mind is crucial to the establishment of the elements of the offense," <u>State v. Brown</u>, 836 S.W.2d 530, 541 (Tenn. 1992); thus, the State may prove premeditation by circumstantial evidence. Several factors support the existence of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." <u>State v. Bland</u>, 958 S.W.2d 651, 660 (Tenn.1997) (citing <u>Brown</u>, 836 S.W.2d at 541–42; <u>State v. West</u>, 844 S.W.2d 144, 148 (Tenn.1992)). Here, the evidence adduced at trial provided circumstantial proof that Petitioner acted with premeditation when he shot the victim. The evidence showed that Petitioner went inside the victim's hotel room concerned the victim he had given information to the police about Chaz Ellis and Bobby Gurley. When he returned from the hotel room, Petitioner told Mr. Carter, "'[T]wo shots to the head[;] he ain't talking no more'" and discarded the shirt

Petitioner had worn into the hotel room. Petitioner told Ms. Littlejohn that he had shot the victim three times and said a prayer for him. This evidence supports the state appellate court's finding that the evidence was sufficient to support Petitioner's conviction for first-degree premeditated murder.

Although Petitioner urges here, as he did on direct appeal, that the witnesses were not credible, Mr. Carter, Ms. Stanton, and Ms. Littlejohn all testified that Petitioner threatened Mr. Carter after learning that Mr. Carter told his girlfriend about taking Petitioner to the victim's hotel. In addition, Ms. Stanton testified that the victim's murder was the subject of the telephone conversations she had with Petitioner. Detective Wall testified that Ms. Littlejohn, Ms. Stanton, and Mr. Carter each gave statements during the investigation that were consistent with each other. A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses, whose demeanor has been observed by the trial court. Marshall v. Lonberger, 459 U.S. 422, 434 (1983). It is the role of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992). This Court will not second guess the jury's credibility determinations. See Boyles v. Sherry, No. 2:06-cv-12207, 2008 WL 4793412, at *12 (E.D. Mich. Oct. 31, 2008 (reiterating that, on habeas review, the court must defer to the jury's findings).

The Court finds that the decision of the Tennessee Court of Criminal Appeals was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, given the evidence and testimony adduced at trial, the Court finds that the state court's decision to reject Petitioner's sufficiency of evidence claim was not an unreasonable application of the law. Petitioner therefore is not entitled to habeas relief on this claim.

### B.    Due process claim

Next, Petitioner alleges that he was denied due process of law under the Fourteenth Amendment when the trial court limited the testimony of Deborah Cox, a defense witness. (Doc. No. 1 at PageID# 7). Respondent contends that, because Petitioner did not raise a constitutional claim of due process on direct appeal, this claim is barred by procedural default. (Doc. No. 11 at PageID# 13).

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way that provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim. Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006); Levine v. Torvik, 986 F.2d 1506, 1516 (6th Cir.), cert. denied, 509 U.S. 907 (1993), overruled in part on other grounds by Thompson v. Keohane, 516 U.S. 99 (1995); Riggins v. McMackin, 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. Wagner v. Smith, 581 F.3d 410, 418 (6th Cir. 2009). In reviewing the state court proceedings to determine whether a petitioner has "fairly presented" a claim to the state courts, courts look to the petitioner's: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." Slaughter v. Parker, 450 F.3d 224, 236 (6th Cir. 2006) (quoting Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005)).

"While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." Slaughter, 450 F.3d at 236 (quoting Blackmon

v. Booker, 394 F.3d 399, 400 (6th Cir. 2004)). "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." Riggins v. McGinnis, 50 F.3d 492, 494 (7th Cir.1995). If a petitioner's claims in federal habeas rest on different theories than those presented to the state courts, they are procedurally defaulted. Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006).

Here, Petitioner raised on direct appeal a claim that the trial court improperly limited the testimony of Deborah Cox regarding a prior inconsistent statement made to her by Stephanie Littlejohn. He made the claim on state law evidentiary grounds, arguing that Ms. Littlejohn's prior inconsistent statement should have been admitted to impeach the credibility of the witness. (Doc. No. 9, Attach. 6 at PageID# 673-75). Petitioner's brief cited Tennessee Rules of Evidence 105 and 404(b). (Id. at PageID# 673). The brief relied on state court cases and did not cite a single federal case. (Id.) In reviewing this claim, the Tennessee Court of Criminal Appeals cited Tennessee Rule of Civil Procedure 36(a) and found that Petitioner had waived the claim because his counsel acquiesced to the trial court's ruling that only the first part of Ms. Cox's testimony was admissible. Watkins, 2014 WL 2547710, at *8. The court therefore denied relief on this claim. Id. In issuing its ruling, the court made no reference to federal law and did not treat Petitioner's claim as one brought under federal law. (Id.)

Consequently, the Court finds that Petitioner did not fairly present his federal due process claim to the state courts. The claim is now barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations under Tennessee Code Annotated § 40-30-102(a), and the "one petition" limitation of § 40-30-102(c). As a result, the claim is deemed to be exhausted (because no avenue for raising the claim in state appellate court remains) but procedurally defaulted for the purpose of federal habeas review.

Federal habeas review of Petitioner's procedurally defaulted claim is barred unless Petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claim will result in a fundamental miscarriage of justice. See Harris, 489 U.S. at 262; Coe, 161 F.3d at 329-30. Petitioner presents no argument establishing cause and prejudice to excuse the default of his claim, and there is no evidence that failure to consider this claim will result in a fundamental miscarriage of justice. Consequently, Petitioner's procedurally defaulted due process claim must be dismissed.

**C.    Ineffective Assistance of Counsel claims**

Petitioner alleges that he was denied ineffective assistance of counsel when trial counsel failed to adequately investigate the case, failed to interview witnesses who could have provided testimony favorable to Petitioner, and failed to consult with Petitioner prior to trial, including failing to prepare Petitioner to testify at trial. He also alleges that he was denied effective assistance of counsel when trial counsel failed to (1) call Clifford Parrish to testify, (2) properly cross-examine Deborah Cox, (3) object to Detective Corey Wall's hearsay statements, and (4) call Lashona Wooten to testify. (Doc. No. 1 at PageID# 5-11).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686-87 (1984); Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. Strickland, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless a petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such

as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in <u>Harrington</u>:

> This is different from asking whether defense counsel's performance fell below <u>Strickland's</u> standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Harrington</u>, 562 U.S. at 101 (internal quotation marks and citation omitted).

### 1.        Pre-Trial Investigation and Preparation

Petitioner contends that trial counsel was ineffective for failing to adequately investigate, failing to interview witnesses who could have provided testimony favorable to Petitioner, and failing to consult with Petitioner prior to trial including preparing Petitioner for testifying at trial. (Doc. No. 1 at PageID# 8-9). In particular, Petitioner argues that counsel failed to interview a potential witness, Lashona Wooten, who testified at Petitioner's first trial. Petitioner believes that "she could [have] identif[ied] an unidentified person" and "would have raised a doubt as to Petitioner's presence at the location where the victim was killed." (<u>Id</u>. at PageID# 9).

Petitioner raised these claims in his petition for post-conviction relief. (Doc. No. 9, Attach. 11 at PageID# 817-18). He argued that counsel should have interviewed Ms. Wooten, who had testified at Petitioner's first trial, because her testimony would have raised a doubt as to Petitioner's presence at the location where the victim was killed. (<u>Id</u>. at 818). He also argued that, before trial, trial counsel only met with Petitioner twice for less than thirty minutes each time and did not

prepare Petitioner for testifying at trial in his own defense. (Id.) According to Petitioner, he waived his right to testify due to being unprepared and, had he testified, he would have told the jury that he was not guilty, pointed out discrepancies in witness testimony, and the result of his trial would have been different. (Id.)

During his post-conviction evidentiary hearing, Petitioner testified that trial counsel only met with Petitioner twice for less than thirty minutes each time and did not prepare Petitioner for testifying at trial in his own defense. (Doc. No. 9, Attach. 12 at PageID# 902). He testified that that they did not discuss whether Petitioner would testify at trial. (Id. at PageID# 903). When asked what he would have said had he been called as a witness, Petitioner responded that he would have told the jury that he did not kill Thomas Turner. (Id.)

At Petitioner's evidentiary hearing, trial counsel testified that, in preparing for trial, he reviewed the transcript from the first trial, visited the crime scene, and spent approximately eight hours reviewing records, exhibits, and photographs. (Doc. No. 9, Attach. 12 at PageID# 923-27). He enlisted the help of a nurse who helped him interpret the medical records and who provided insight on the photographs of the deceased victim; counsel filed a motion in limine to exclude those photographs. (Doc. No. 9, Attach. 12 at PageID# 925). He worked with prior counsel's investigator and hired his own investigator. (Id. at 933-34). He interviewed all of the witnesses himself, including Ms. Wooten. (Id. at 927-28). Counsel also testified that he advised Petitioner that it would be to be advantage to testify if he could do so truthfully, but if he felt anything may go wrong or that he may get crossed up, then to "think twice" about taking the stand. (Id. at 928-29). Trial counsel emphasized that the decision to testify or not was left to Petitioner. (Id. at 938-39).

The post-conviction court denied relief, explicitly accrediting trial counsel's testimony at the post-conviction hearing, finding that "Petitioner has not met his burden of establishing by clear and convincing evidence that Trial Counsel was ineffective in his trial preparation or that Petitioner was prejudiced by any alleged deficiency." (Doc. No. 9, Attach. 11 at PageID# 848-49). The court found that "[n]othing in the record indicates that Trial Counsel failed to meet with the Petitioner and keep him informed of the proceedings." (Id.)

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals set forth the governing legal standard for claims of ineffective assistance of counsel. Id. at *5. Applying Strickland to the facts of Petitioner's case, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that trial counsel's performance was not deficient or prejudicial, finding that "[t]rial counsel was a very experienced trial attorney who conducted a thorough investigation of the facts, reviewed the record from the first trial, and communicated with the petitioner about the facts, defense theories, and the pros and cons of testifying in his own defense." Id. at *6. The court specifically accredited the testimony of trial counsel over that of the petitioner, finding that trial counsel conducted a thorough investigation, adequately met with the petitioner to review the previous trial transcript and the facts of the case, and effectively communicated with the petitioner about the case, including his options regarding testifying at trial. Id. at *5.

These findings were not unreasonable. With regard to Petitioner's claim that trial counsel failed to adequately investigate and prepare for trial, trial counsel testified at Petitioner's post-conviction evidentiary hearing that he had been practicing law in the state of Tennessee for about thirty-nine years and roughly half of his practice had been dedicated to criminal defense work. (Doc. No. 9, Attach. 12 at PageID# 920-21). Trial counsel testified that, despite having been hired

by Petitioner's family only three weeks prior to his second trial, counsel was able to devote himself entirely to Petitioner's case from the date he was retained until the trial. (Doc. No. 9, Attach. 12 at PageID# 922-23). Counsel testified that he met with Petitioner three different times for about an hour each time, during which time they reviewed the transcript from the first trial "line by line." (Id. at PageID# 923, 925). Counsel felt that the meetings were "very productive" and that he and Petitioner "had no problems communicating." (Id. at PageID# 924). Counsel spoke with Petitioner about possible defenses and witnesses. (Id. at PageID# 925). Counsel filed three motions in limine on Petitioner's behalf and visited the crime scene before the trial as part of his preparation. (Id. at PageID# 926). He spent approximately eight hours reviewing records and exhibits. (Id.) He enlisted the assistance of a nurse who provided insight on the photographs of the deceased and filed a motion in limine to exclude the photographs. (Id.) In addition to working with prior counsel's investigator, trial counsel retained the services of his own investigator.

With regard to Petitioner's allegation that trial counsel failed to interview Lashona Wooten, trial counsel testified that he interviewed all of the defense witnesses himself, including Ms. Wooten. This Court must defer to the state court's credibility determinations of witnesses whose demeanor has been observed by that court, unless Petitioner demonstrates the state credibility determinations are not supported by the record. See Rice v. Collins, 546 U.S. 333, 339 (2006) ("Reasonable mind reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determinations"); Bennett v. Mills, No. 1:06-cv-254, 2007 WL 2823324, at *6 (E.D. Tenn. Sept. 27, 2007) (in determining whether the petitioner had submitted credible new evidence of actual innocence, deferring to the state court's credibility determinations). Petitioner has not demonstrated that the state court's credibility determinations are unsupported by the record.

With respect to Petitioner's allegation that trial counsel failed to consult with him prior to trial, the Tennessee Court of Criminal Appeals credited trial counsel's testimony at the post-conviction evidentiary hearing that he met with Petitioner three times for an hour each and that those meetings very productive.   This Court will not redetermine the credibility of witnesses whose demeanor has been observed by the trial court.  Marshall, 459 U.S. 422, 434.

The constitutional right of a defendant to testify at trial is well established and subject only to a knowing and voluntary waiver by the defendant.  Rock v. Arkansas, 483 U.S. 44, 49 (1987). Defense counsel's role is to advise the defendant whether to take the stand; ultimately, the defendant must decide for himself.  See Pelzer v. United States, No. 96-1195, 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (citation omitted).  To the extent that Petitioner argues that trial counsel's failure to consult with him prior to trial resulted in Petitioner being unprepared to testify in his own defense, counsel testified at the evidentiary hearing that he had extensive conversations with Petitioner about the possibility of testifying.  (Doc. No. 9, Attach. 12 at PageID# 928).  Trial counsel testified that he advised Petitioner that it would be to his advantage to testify at trial if he could do truthfully, but if he felt anything may go wrong or he may get crossed up, then to "think twice" about taking the stand.  Trial counsel emphasized that the decision whether or not to testify was left to Petitioner, who made his decision after being advised of his rights by the court and executing a Moman waiver.

Even if Petitioner had established that counsel's performance was deficient as alleged, Petitioner has not established that he was prejudiced by it.  Petitioner has failed to show how better preparation for trial would have resulted in a reasonable probability of a different trial outcome considering the evidence against him.  See Kelley v. United States, No. 1:13-cv-70, 1:08-cr-51,

2014 WL 2921821, at *14 (E.D. Tenn. June 27, 2014) (holding that petitioner's unsupported claims of what counsel failed to do, without any evidence of what a more thorough investigation would have revealed, was insufficient to demonstrate by a preponderance of the evidence that counsel performed deficiently; moreover, even assuming that counsel performed deficiently, petitioner failed to establish a reasonable probability, that had counsel conducted a more extension investigation, the outcome of Petitioner's case would have been different). Furthermore, Petitioner does not provide any specifics as to, had he chosen to testify in his own defense, what his trial testimony would have been. The Sixth Circuit has instructed that when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." Baze v. Parker, 371, F.3d 310, 322 (6th Cir. 2004), cert. denied, 544 U.S. 931 (2005).

As to Petitioner's allegations of ineffective assistance based on counsel's pre-trial investigation and preparation, the Court finds that Petitioner has not shown he is entitled to relief because the state appellate court's determinations were not contrary to Strickland. Neither were they based on an unreasonable application of the facts or an unreasonable application of Strickland's standard to those facts. Thus, Petitioner is not entitled to relief on those claims.

### 2.     During Trial

Petitioner also claims that trial counsel provided ineffective assistance of counsel during Petitioner's second trial. In particular, Petitioner alleges that trial counsel (1) failed to call Clifford Parish to testify; (2) failed to properly cross-examine Deborah Cox; (3) failed to object to Detective Corey Wall's alleged hearsay statements; and (4) failed to call Lashona Wooten to testify. (Doc. No. 1 at PageID #9, 11). According to Respondent, the state court's rejection of Petitioner's claims that he was denied effective assistance of counsel was not contrary to, or an unreasonable

application of <u>Strickland</u>, or based on an unreasonable determination of the facts in light of the evidence before the state court. (Doc. No. 11 at PageID# 16).

### a.     Failure to call Clifford Parrish to testify

First, Petitioner alleges that trial counsel was ineffective in failing to call Clifford Parrish to testify at trial. (Doc. No. 1 at PageID# 18). According to Petitioner, Mr. Parrish "would have testified that Stephanie Littlejohn confessed to him that she committed the murder for which Petitioner was charged." (<u>Id</u>.)

In his post-conviction petition, Petitioner argued that trial counsel had provided ineffective assistance by failing to locate Mr. Parrish as a witness. (Doc. No. 9, Attach. 11 at PageID# 819). Petitioner posited that Mr. Parrish would have been a beneficial defense witness because he could testify that Ms. Littlejohn had confessed to murdering Thomas Turner.

Mr. Parrish testified at Petitioner's post-conviction hearing that he had known Petitioner for over thirty years (<u>id</u>. at 877) and that Ms. Littlejohn had told him that she had committed the murder, not Petitioner. (Doc. No. 9, Attach. 12 at PageID# 880). Mr. Parrish testified that he was unaware Petitioner had been tried twice and stated on direct examination that he had not relayed Ms. Littlejohn's confession to the police or defense counsel. (<u>Id</u>. at 881-82). On cross-examination, Mr. Parrish indicated it was possible he was confused about the time frame when he conveyed Ms. Littlejohn's statement to Petitioner's aunt. (<u>Id</u>. at 882-83).

Trial counsel testified at Petitioner's post-conviction evidentiary hearing that he and Petitioner had discussed the witnesses he wanted to call and that Petitioner did not mention Mr. Parrish. In fact, counsel testified that he had never heard of Mr. Parrish. (<u>Id</u>. at PageID# 925). The post-conviction court denied relief, accrediting counsel's testimony that he had never heard of Mr. Parrish as a potential witness. (Doc. No. 9, Attach. 11 at PageID# 852).

Petitioner raised this claim on appeal of the denial of his post-conviction petition. The Tennessee Court of Criminal Appeals affirmed the denial of relief, agreeing with the post-conviction court that trial counsel "was a very experienced trial attorney who conducted a thorough investigation of the facts, reviewed the record from the first trial, and communicated with the petitioner about the facts, defense theories, and the pros and cons of testifying in his own defense." Watkins, 2017 WL 1048130, at *6. The Tennessee Court of Criminal Appeals applied Strickland and affirmed, concluding that the evidence in the record supported the post-conviction court's conclusion that trial counsel's performance was not deficient or prejudicial. Id. at *8.

The state courts' findings were not unreasonable. Trial counsel testified at Petitioner's post-conviction evidentiary hearing that he had never heard of Mr. Parrish. This Court must defer to the state court's credibility determinations of witnesses whose demeanor has been observed by that court, unless Petitioner demonstrates the state credibility determinations are not supported by the record. See Rice v. Collins, 546 U.S. 333, 339 (2006) ("Reasonable mind reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determinations"); Bennett v. Mills, No. 1:06-cv-254, 2007 WL 2823324, at *6 (E.D. Tenn. Sept. 27, 2007) (in determining whether the petitioner had submitted credible new evidence of actual innocence, deferring to the state court's credibility determinations).

Neither has Petitioner shown prejudice resulting from trial counsel's failure to offer Mr. Parrish's testimony. The record reflects that Mr. Parrish had some credibility issues. In addition, Mr. Parrish's testimony regarding Ms. Littlejohn's confession would have been cumulative to the testimony of Deborah Cox, who testified that Ms. Littlejohn confessed to her that Ms. Littlejohn--not Petitioner--killed the victim. (Doc. No. 9, Attach. 3 at PageID# 460). No prejudice accrues

to a petitioner when an attorney fails to offer cumulative evidence. See Beuke v. Houk, 537 F.3d 618, 645 (6th Cir. 2008) ("A petitioner does not establish prejudice if he shows only that his counsel failed to present 'cumulative' mitigation evidence, that is, evidence already presented to the jury ."); Allen v. Howes, 438 F. App'x 432, 435 (6th Cir. Aug. 25, 2011) (counsel's failure to present cumulative testimony does not result in prejudice).

Accordingly, the Court finds that the state court's decision was based on a reasonable determination of the facts and that the state court's application of the Strickland factors was reasonable. Petitioner therefore is not entitled to relief on the basis of this claim.

### b.      Failure to effectively cross-examine Deborah Cox

Next, Petitioner alleges that trial counsel failed to effectively cross-examine Deborah Cox, a defense witness. Specifically, Petitioner alleges that trial counsel should have pointed out "discrepancies in her testimony between the first and second trial[s]." (Doc. No. 1 at PageID# 11).

The petitioner raised this claim in his petition for post-conviction relief. (Doc. No. 9, Attach. 11 at PageID#  819).  He argued that trial counsel should have brought to light discrepancies in Ms. Cox's testimony between the first and second trials. (Id.)  During Petitioner's post-conviction hearing, counsel testified that he would have liked "a little more latitude in . . . developing Ms. Cox's testimony" but was limited by the trial court's rulings. (Id. at PageID# 937). On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals deferred to the post-conviction court's accreditation of counsel's testimony that he developed her testimony to the best of his ability given the trial court's rulings and found that counsel had not provided ineffective assistance in this regard. Watkins, 2017 WL 1048130, at *5.

The state courts' findings were not unreasonable. Cross-examination is the "principal means by which the believability of a witness and the truth of [her] testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). "Though a failure properly to cross-examine a witness could

form the basis for a finding of ineffective assistance, Jackson v. Houk, 687 F.3d 723, 742-43 (6th Cir. 2012), typically, a decision as to 'whether to engage in cross-examination, and if so to what extent and in what manner, [is] ... strategic in nature.'" Miller v. Howerton, No. 1:12-cv-50-HSM-WBC, 2015 WL 796310, at *11 (E.D. Tenn. Feb. 25, 2015) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.1987)); see Hodge v. Haeberlin, 579 F.3d 627, 641 (6th Cir. 2009) (citing Cobb v. Perini, 832 F.2d 342, 347-48 (6th Cir. 1987)) (decisions regarding how to examine or cross-examine a witness are strategic). Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel because in retrospect better tactics might have been available. Johnson v. Hofbauer, 159 F. Supp.2d 582, 607 (E.D. Mich. 2001).

Counsel's performance did not constitute ineffective assistance of counsel. The record shows that trial counsel questioned Ms. Cox, who was his own witnesses, and testified that he would have liked to have asked more questions of her but was limited by the trial court's rulings. And, even if Petitioner could show deficient performance as required by the first prong of the Strickland test, he cannot establish the necessary prejudice required by the second prong. Petitioner's claims related to these tactical matters simply do not support a claim of ineffective assistance of counsel.

The Court finds that the state court's determination was not contrary to Strickland. Neither was the court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable application of Strickland's standards to those facts. Thus, Petitioner is not entitled to relief on this claim.

### c. Failure to object to the testimony of Detective Wall

Petitioner alleges that trial counsel was ineffective by failing to object to the testimony of Detective Wall. Petitioner claims Detective Wall gave hearsay testimony during the trial which

"gave the impression to the jury that these witnesses had information that incriminated petitioner and that this hearsay improperly bolstered their testimony at trial." (Doc. No. 1 at PageID# 9).

Petitioner raised this claim in his petition for post-conviction relief. (Doc. No. 9, Attach. 11 at PageID# 819-20). He alleged that trial counsel failed to object to hearsay testimony by Detective Wall as follows:

> Specifically, Detective Wall testified to what Stevie Downs told him, which led to his contacting another person, Chaz Ellis. Detective Wall then testified as to what Mr. Ellis told him, specifically that he should contact Stephanie Littlejohn and Brianna Stanton. Detective Wall then testified, without objection by trial counsel, to what Ms. Littlejohn told him.

(Id.) Similar to his current argument, Petitioner asserted that the substance of these multiple hearsay statements "gave the impression to the jury that these witnesses had information that incriminated Petitioner, and that this hearsay improperly bolstered their testimony at trial" and, "had this hearsay not been admitted, he would not have been convicted and the result of his case would have been different." (Id. at 820).

Petitioner testified at his post-conviction evidentiary hearing that trial counsel allowed hearsay through witnesses which created a negative inference that Petitioner had confessed. (Doc. No. 9, Attach. 12 at PageID# 908-09). The record does not provide any explanation as to why defense counsel did not object to this testimony and Petitioner failed to question defense counsel about this issue during the post-conviction hearing.

The post-conviction court denied relief, noting from its review of the trial transcript that "[t]he majority of the testimony concerned how Detective Wall found individual[s'] names in the deceased's phone and went to speak to each one who directed him to the next individual." (Doc. No. 9, Attach. 11 at PageID# 856-57). The court further noted that the detective gave "general" testimony and did not testify as to what each defendant told him, but instead as to what he actions

he took based on what each individual said. (Id. at PageID# 857). The court, therefore, concluded that there was "no evidentiary error" in Detective Wall's testimony and that Petitioner had not established by clear and convincing evidence that trial counsel was ineffective or that Petitioner was prejudiced by the alleged deficiency. (Id.)

On direct appeal of the denial of post-conviction relief on this claim, the Tennessee Court of Criminal Appeals affirmed, finding that "[t]he record fully supports the findings and conclusions of the post-conviction court." Watkins, 2017 WL 1048130, at *6.

The state courts' findings were not unreasonable. The jury heard directly from nearly all of the witnesses who were mentioned by Detective Hall in his testimony. Petitioner has not established that, had counsel objected to Detective Hall's testimony, the court would have granted the objection. Neither has Petitioner established that, even if counsel was deficient in failing to object to Detective Hall's testimony, Petitioner was prejudiced and that the outcome would have been different in light of the overwhelming evidence against Petitioner.

The Court finds that the state court's determination was not contrary to Strickland. Neither was the court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable application of Strickland's standards to those facts. Thus, Petitioner is not entitled to relief on this claim.

### d. Failure to call Lashona Wooten to testify

In his final claim of ineffective assistance of trial counsel, Petitioner argues that counsel failed to call Lashona Wooten, who testified at Petitioner's first trial. (Doc. No. 1 at PageID# 9). Petitioner believes that "she could [have] identif[ied] an unidentified person" and "would have raised a doubt as to Petitioner's presence at the location where the victim was killed." (Id.).

Petitioner challenged the effectiveness of his trial counsel on this same ground during his state post-conviction proceedings. (Doc. No. 9, Attach. 11 at PageID# 85). He argued that Ms. Wooten would have testified that she did not see Petitioner at the scene of the crime and instead saw "another individual she could identify and an unidentified person." <u>Watkins</u>, 2017 WL 1048130, at *2. In denying relief, the post-conviction court found that trial counsel made a strategic decision not to call Ms. Wooten at the second trial and Petitioner had not established by clear and convincing evidence that trial counsel was ineffective or that Petitioner was prejudiced by the alleged deficiency. The post-conviction court therefore denied relief. (Doc. No. 9, Attach. 11 at PageID# 88-89).

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals affirmed, agreeing with the post-conviction court that trial counsel had made a strategic decision not to call Ms. Wooten based on her demeanor and attitude on the day of the trial. <u>Watkins</u>, 2017 WL 1048130, at *6. The court found that trial counsel "offered a reasonable explanation for why he did not call Ms. Wooten as a witness" and that Petitioner had not met his burden of demonstrating any deficiencies in counsel's performance or any resulting prejudice to his case. <u>Id</u>.

The state courts' findings were not unreasonable. Counsel testified at Petitioner's post-conviction evidentiary hearing that he was aware of Ms. Wooten's testimony during Petitioner's first trial. After interviewing her, he "had . . . chills" based on her demeanor and body language and determined believed she would not "be anything but a liability for the Petitioner if she were to testify." (Doc. No. 9, Attach. 12 at PageID# 927). Counsel therefore decided not to call her as a witness.

With respect to trial counsel's strategic decision not to call Ms. Wooten as a witness, it is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." Dixon v. Houk, 737 F.3d 1003, 1012 (6th Cir. 2013). In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Strickland, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." Id. at 690. Counsel made an informed, strategic decision not to call Ms. Wooten because he believed her testimony would have been detrimental to Petitioner's defense. This decision was not outside of the professional norms for criminal defense attorneys.

Even if Petitioner could establish that counsel's failure to call Ms. Wooten as a witness was deficient, he cannot establish that he was prejudiced by it and that the outcome would have been different in light of the overwhelming evidence against Petitioner. Consequently, the Court finds that Petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to Strickland. Neither was the appellate court's determination based on an unreasonable determination of the facts or an unreasonable application of Strickland's standards to those facts. This claim, like the others, will be dismissed.

## V.    Conclusion

For the reasons set forth herein, the petition filed by Cedric Watkins seeking relief under Section 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a

COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller–El, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a COA.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE